David E. Bower (119546)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
Email: dbower@faruqilaw.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES CANNON, Derivatively on Behalf of Nominal Defendant BRIDGEPOINT EDUCATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW S. CLARK, DANIEL J. DEVINE, JANE McAULIFFE, RODNEY T. SHENG, PATRICK HACKETT, RYAN CRAIG, ROBERT HARTMAN, ADARSH SARMA, DALE CRANDALL, DR. MARYE ANNE FOX, and ANDREW M. MILLER,<br><br>Defendants,<br><br>-and-<br><br>BRIDGEPOINT EDUCATION, INC.<br><br>Nominal Defendant. | Case No. 3:13-cv-2645 WQH BLM<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**1. Breach of Fiduciary Duties**<br>**2. Abuse of Control**<br>**3. Gross Mismanagement**<br>**4. Waste of Corporate Assets**<br>**5. Breach of Fiduciary Duty of Loyalty and Good Faith in Connection with Insider Stock Sales**<br>**6. Unjust Enrichment**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>**FILED UNDER SEAL** |

Plaintiff James Cannon ("Plaintiff"), by and through his attorneys, derivatively on behalf of nominal defendant Bridgepoint Education, Inc.

("Bridgepoint" or the "Company), submits this Verified Shareholder Derivative Complaint against the directors and officers named herein (collectively, the "Individual Defendants"). Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief developed from the investigation and analysis of his counsel, which includes, among other things, the review of certain of the Company's Board of Directors' materials garnered through a request for such information pursuant to 8 Del. C. §220, public filings by Bridgepoint with the U.S. Securities and Exchange Commission ("SEC"), as well as press releases, news reports, analyst reports, matters of public record available from various state and federal government websites, complaints pending against the Company in state and federal courts, and other information available in the public domain.

## SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Bridgepoint against current officers and certain members of the Board of Directors (the "Board"), who are disabled from responding to a litigation demand by any Bridgepoint shareholder because of their insider connections, tenure on the board, and personal profit from the alleged wrongdoing.

2. The Individual Defendants' (as defined below) wrongful conduct extends at least from May 3, 2011 to July 13, 2012 (the "Relevant Period"). On behalf of Bridgepoint, Plaintiff seeks monetary damages and injunctive relief by way of significant corporate and managerial reforms to prevent future harm to the Company by disloyal directors and officers.

3. Bridgepoint is a for-profit, post-secondary education services provider with academic institutions online and in at least two physical locations. These two

locations are Ashford University ("Ashford") in Clinton Iowa, and University of the Rockies in Colorado Springs, Colorado.

4. Bridgepoint purchased what is now known as Ashford University in March 2005. Prior to the acquisition by Bridgepoint, Ashford was called Mount St. Clare College, The Franciscan University, and The Franciscan University of the Prairies ("Franciscan University"). In each of these earlier incarnations, the school was run as a traditional not-for-profit school. Bridgepoint converted the school to its current for-profit commercial status.

5. When Bridgepoint purchased Ashford, the school was accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools ("HLC"). This accreditation had been certified in 2006 and would not come up for comprehensive review until 2014.

6. Although Ashford's physical campus is in Iowa, it also offers online courses. The majority of the students in its online programs resided in the San Diego, California area. Because this large portion of Ashford's student body was outside of the HLC's jurisdiction, it endangered Ashford's HLC accreditation when the HLC adopted a policy requiring institutions to demonstrate a "substantial presence" in HLC's region (the north central portion of the United States) in 2010. Therefore, in August 2010, Bridgepoint began the process of obtaining accreditation from the Western Association of Schools and Colleges ("WASC"), the regional accreditor for schools in the San Diego area.

7. Bridgepoint is required to maintain proper accreditation because it derives a substantial amount of its revenue from various federal student financial assistant programs. Under Title IV of the Higher Education Act of 1965, higher education institutions must be accredited by a Department of Education approved accreditor to enable students to access its financial assistance programs. If an

educational institution is not properly accredited, its students cannot obtain federal student financial assistance. The vast majority of students matriculating at Ashford require these federal loans in order to afford to attend the school.

8. Bridgepoint attempted to gain WASC accreditation through "Pathway B," which was the WASC accreditation process for established institutions that already maintain accreditation with another Department of Education recognized accrediting agency. Pathway B required schools to meet the same as Standards of Accreditation as an initial accreditation and was simply an expedited process. On May 23 and June 3, 2011, WASC sent Bridgepoint letters stating areas of focus that Bridgepoint needed to address in order to gain WASC accreditation. These issues included inadequate student retention and degree completion, insufficient student progress tracking, insufficient core of full-time faculty, and lack of an empowered and independent governing board. Bridgepoint never informed the public of these letters. They were only revealed to the public by WASC in its eventual denial letter. Several executives and directors did, however, act upon the information in the letters for their own personal gain by selling Bridgepoint stock at its Relevant Period high price.

9. Even after these warning letters, the Individual Defendants continued to portray Ashford's accreditation prospects positively in all of Bridgepoint's public statements, while failing to take sufficient actions to rectify the inadequacies described in the letters.

10. On July 3, 2012, WASC formally denied Ashford's accreditation for a laundry list of reasons. The WASC rejection caused HLC to place Ashford on "special monitoring status" because of the WASC denial and other allegedly significant deficiencies. Based on Board materials obtained pursuant to 8 Del. C.

§220, the denial of accreditation should not have come to a surprise to the Board even though they completely concealed it from the public.

11. During the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements about the Company's accreditation prospects, operations, management, and internal controls. In particular the Individual Defendants failed to disclose that WASC had numerous concerns with Bridgepoint's practices at Ashford University and was likely to deny accreditation. Maintaining proper accreditation is material for Bridgepoint, because without accreditation the Company is disqualified from receiving the federal funding upon which it derives upwards of 93.7% of its annual revenue.

12. The Individual Defendants knew that Bridgepoint's stock was artificially inflated and neglected to inform shareholders of the truth, in violation of their fiduciary duties.

13. Furthermore, the Individual Defendants' issuance of these materially false and misleading statements have subjected Bridgepoint to a complaint for violation of the federal securities laws, currently pending in this Court and captioned *In re Bridgepoint Education Inc. Securities Litigation*, No. 3:12-CV-1737-JM-WMC (S.D. Cal., consolidated complaint filed Dec. 21, 2012) (hereinafter, the "Securities Class Action"). In defending the Securities Class Action, Bridgepoint has incurred investigative and litigation costs, and is faced with substantial potential liability for violations of securities laws and the costs of defending the suit. On September 13, 2013, this Court issued an Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Securities Class Action. In this Order, this Court held that the Company's statements regarding student persistence were false and misleading on their face and that the statements

regarding Ashford's accreditation application with WASC may be revealed to be false and misleading in discovery.

14. As a result of the Board's action and failure to maintain proper internal controls, Bridgepoint made false and misleading statements concerning the adequacy of its academic programs and its accreditation prospects and caused the Ashford to be denied initial accreditation by WASC and to come under closer scrutiny by its current accreditor, HLC. The Individual Defendants' wrongful conduct, in derogation of their fiduciary duties of loyalty, trust, good faith, and candor, continues to expose the Company to substantial liability. Plaintiff therefore seeks damages and other relief on behalf of the Company.

## JURISDICTION AND VENUE

15. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332. All defendants are completely diverse from the plaintiff and the amount in controversy exceeds $75,000.00.

16. This Court has personal jurisdiction over each of the defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17. Venue is proper in this District pursuant to 28 U.S.C. §1391 because (i) one or more of the defendants either resides or maintains executives offices in the District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (iii) defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in the District.

## PARTIES

### Plaintiff

18. Plaintiff James Cannon is presently a shareholder of Bridgepoint. Plaintiff has been a shareholder at all times necessary to the claims asserted herein and will remain through the conclusion of this litigation. Plaintiff is a citizen of Kansas.

### Nominal Defendant

19. Nominal Defendant Bridgepoint is a Delaware corporation with its principal executive offices located at 13500 Evening Creek Drive North, Suite 600, San Diego, California 92128. Bridgepoint is a provider of for-profit post-secondary education services.

### Individual Defendants

20. Defendant Andrew S. Clark ("Clark") co-founded Bridgepoint with the help of private equity firm Warburg Pincus LLC ("Warburg Pincus"). He has served as the Company's Chief Executive Officer ("CEO") since November 2003, President since February 2009, and as a director since November 2003. Prior to his time at Bridgepoint, Defendant Clark spent 14 years managing for-profit post-secondary education. He served in various management roles for University of Phoenix from 1992 to 2001, including as Regional Vice President from 1999 to 2001. Defendant Clark also currently serves on the Board of Trustees for Bridgepoint's University of the Rockies and served on the Board of Trustees for Bridgepoint's Ashford University from March 2005 to December 2008. Defendant Clark is a citizen of California.

21. Defendant Daniel J. Devine ("Devine") has served as Bridgepoint's Chief Financial Officer ("CFO") since January 2004 and as the Company's Executive Vice President since January 2011. He also served as Bridgepoint's

Principal Accounting Officer until January 1, 2011. He is a certified public accountant ("CPA") and served as the CFO of Protocol Marketing Group and A-Life Medical prior to his tenure at Bridgepoint. Defendant Devine is a citizen of California.

22. Defendant Jane McAuliffe ("McAuliffe") has served as Bridgepoint's Chief Academic Officer since November 2008 and as the Company's Executive Vice President of External Affairs since December 2010. Defendant McAuliffe also serves as the CEO and as a Trustee of Bridgepoint's Ashford University. She also served as Ashford's Chancellor and President from July 2005 to December 2010. Prior to her time at Bridgepoint, Defendant McAuliffe gained extensive experience in for-profit post-secondary education. She served as President of the Sarasota campus of Argosy University from 2003 to 2005; Vice President of Academic Affairs at American InterContinental University from 2002 to 2003; and as Dean, Associate Dean, Program Chairman, and Program Director in the College of Education at University of Phoenix from 1996 to 2002. Defendant McAuliffe is a citizen of California.

23. Defendant Rodney T. Sheng ("Sheng") has served as Bridgepoint's Chief Administrative Officer since November 2008 and Executive Vice President since January 2011. Prior to that, Defendant Sheng served as the Company's Vice President of Operations from January 2004 to November 2008 and as Senior Vice President from November 2008 to December 2010. Defendant Sheng first started working for Bridgepoint in January 2004 and has worked in for-profit post-secondary education for the past 18 years. Prior to his time at Bridgepoint, Defendant Sheng worked at University of Phoenix from 1995 to 2003 in a variety of management roles. Defendant Sheng is a citizen of California.

24. Defendant Patrick Hackett ("Hackett") has served as a director of Bridgepoint since March 2008 and as Chairman of the Board since February 2009. Defendant Hackett has also served as the Chairman of the Compensation Committee of Bridgepoint since 2009. In addition to his duties at Bridgepoint, Defendant Hackett has worked at Warburg Pincus, the private equity firm that helped found Bridgepoint, since 1990. He has served at Warburg Pincus as a Managing Director alongside Defendant Adarsh Sarma and Co-Head of the Technology, Media and Telecommunications group and is also a General Partner. Additionally, Defendant Hackett was a colleague of Defendant Ryan Craig at Warburg Pincus from 2001 to 2004. Defendant Hackett is a citizen of Connecticut.

25. Defendant Ryan Craig ("Craig") has served as a director of Bridgepoint since November 2003. Defendant Craig has also served on the Bridgepoint Audit Committee since 2009, Nominating and Governance Committee since 2009, Compensation Committee from 2009 to February 2012, and Strategic Oversight Committee since its creation in 2012. Defendant Craig currently serves and is a founding partner of University Ventures, a private equity firm focused on for-profit higher education. From 2001 to 2004, Defendant Craig was an Associate at Warburg Pincus in the education sector where he worked with Defendant Hackett. Defendant Craig is a citizen of New York.

26. Defendant Robert Hartman ("Hartman") has served as a director of Bridgepoint since November 2006. Defendant Hartman has also served on the Bridgepoint Audit and Nominating and Governance Committees since 2009. In addition to his service at Bridgepoint, he has an extensive background in for-profit post-secondary education. From 1979 to September 2005, Defendant Hartman served in various management positions—including President, CEO, and Chairman of the Board—at the for-profit technical education institution Universal

Technical Institute. Additionally, Defendant Hartman was appointed by the Governor of Arizona to the Arizona State Board for Private Post-secondary Education in 1990 and served until 1995 and served on the Advisory Council for the Arizona Educational Loan Program, representing the private career school sector. Defendant Hartman was also the Founder and Chairman of the Western Council of Private Career Schools. Defendant Hartman is a citizen of Arizona.

27. Defendant Adarsh Sarma ("Sarma") has served as a director of Bridgepoint since July 2005. He has also served as the Chairman of Bridgepoint's Nominating and Governance Committee since 2009 REDACTED [redacted] REDACTED [redacted] Additionally, Defendant Sarma has been a member of Bridgepoint's Compensation Committee since 2009 and continues to be a member of the Company's Strategic Oversight Committee. Defendant Sarma has also served at Warburg Pincus—the private equity firm that helped found Bridgepoint—as a Managing Director alongside Defendant Hackett in the Technology, Media and Telecommunications group and as a Principle since April 2005. Defendant Sarma is a citizen of New York.

28. Defendant Dale Crandall ("Crandall") has served as a director of Bridgepoint since December 2008. Defendant Crandall has served as the Chairman of the Audit Committee since 2009 and has been determined by the Bridgepoint Board to be an audit committee financial expert. He has also served on the Compensation Committee since 2009 and on the Strategic Oversight Committee since its founding in 2012. Additionally, he is currently the Chairman of the Strategic Oversight Committee. Defendant Crandall is a citizen of California.

29. Defendant Marye Anne Fox ("Fox") has served as a director of Bridgepoint since November 2011. She has also served Bridgepoint as a member

of the Nominating and Governance Committee since November 2011. Defendant Fox has an extensive background in post-secondary education. Since 2004, Defendant Fox has been a Chancellor of the University of California – San Diego. Prior to that she was a Chancellor and professor of Chemistry at North Carolina State University. Additionally, she served on the Board of Trustees for Dartmouth College and the University of Notre Dame. Defendant Fox is a citizen of California.

30. Defendant Andrew M. Miller ("Miller") served as a director of Bridgepoint from February 2012 to July 31, 2013. He also served as a member of the Compensation Committee during that period. Defendant Miller is a citizen of California.

31. The defendants referenced above in ¶¶ 20-30 are collectively referred to herein as the "Individual Defendants." The defendants referenced in ¶¶ 20, 24-30 above are collectively referred to herein as the "Director Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32. The Individual Defendants have stringent fiduciary obligations to Bridgepoint and its shareholders.

33. By reason of their positions as officers, directors and/or fiduciaries of Bridgepoint and because of their ability to control the business and corporate affairs of Bridgepoint, the Individual Defendants owe Bridgepoint and its shareholders fiduciary obligations of trust, loyalty, good faith, due care, disclosure, candor, and oversight, and are required to use their utmost ability to control and manage Bridgepoint in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Bridgepoint and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34. Each director and officer of the Company owes to Bridgepoint and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's financial forecasts and business prospects.

35. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bridgepoint, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Bridgepoint, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, market demands for products and services, and improper representations of Bridgepoint.

36. To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a. refrain from acting upon material inside corporate information to benefit themselves;

b. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

c. remain informed as to how Bridgepoint conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

d. ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules, and regulations;

e. properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statement about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

f. ensure that the Company's accreditation projections were based on appropriate support and documentation, and were routinely checked for accuracy;

g. ensure that the Company's programs required for accreditation were appropriately employed and progressing towards compliance, and were routinely checked for accuracy;

h. ensure that there were sufficient checks and balances in Bridgepoint's academic integrity functions, and related functions, to prevent loss of accreditation or reputation; and

i. ensure that no inaccurate material information about Bridgepoint was released to the public that would tend to artificially inflate Bridgepoint's stock, and that would thus cause corresponding greater harm to the Company's value when the truth was revealed.

37. Moreover, Bridgepoint maintains a Code of Ethics (hereafter, the "Code"), which applies to "All employees, officers and directors of the Company." The purpose of the Code is to "promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships" The Code states in relevant part:

> **1. Compliance with Laws, Rules and Regulations**
>
> Company policy requires that all employees, officers and directors of the Company, comply fully with both the spirit and the letter of all laws, rules and regulations. This specifically includes requirements under the Higher Education Act, as amended, regulations of the United States Department of Education, the policies of accrediting agencies, as well as other state and federal laws. Whenever an applicable law, rule or regulation is unclear or seems to conflict with either another law or any provision of the Code, all employees, officers and directors are urged to seek clarification from their supervisor or the Vice President of Ethics and Compliance ("Ethics Officer"), the Company employee designated to handle such matters, whose contact information is set forth in Section 10 below. The Code is in addition to, and should be read in conjunction with the Company's existing policies, practices and procedures, including, but not limited to, the Company's policies on securities trades, proprietary inventions, trade secrets and employee conduct/harassment.
>
> ***
>
> **3. Fair Dealing**
>
> Although the success of our Company depends on our ability to outperform our competitors, the Company is committed to achieving success by fair and ethical means. We seek to maintain a reputation for honesty and fair dealing among our competitors and the public alike. In light of this aim, the Company prohibits employees from engaging in any dishonest, unethical or illegal business practices. An exhaustive list of unethical practices cannot be provided. Instead, the Company relies on the judgment of each individual employee to avoid such practices. Furthermore, each employee should endeavor to deal

fairly with the Company's customers, suppliers, competitors and employees. No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair business practice.

**4. Books and Records, Accounting Controls and Disclosures**

The Company requires that all its books and records be maintained accurately and with honesty. This requires that no fund, asset, liability, revenue or expense be concealed or improperly or incompletely recorded for any purpose. All entries must be supported by documentation adequate to permit the books and records to be verified by audit. Proper accounting requires not only careful compliance by the Company's accountants, but also the cooperation of all employees who are involved in keeping financial records of any type.

The Company's accounting controls and procedures are essential to ensuring the accurate reporting of the Company's financial information. The Audit Committee of the Board has the responsibility of reviewing the Company's policies and practice with respect to financial reporting. By conducting this review, the Audit Committee of the Board helps the Company identify deficiencies in its practices so that they can be promptly corrected. Auditors will have unrestricted access to all Company documents and records. All employees are required to cooperate fully with internal and external audits, especially as it relates to audits of our system of internal controls, financial statements or accounting books and records. In no case may an employee make a false or misleading statement to any internal or external auditor, withhold records, or otherwise interfere with an audit. No employee should coerce, manipulate, mislead, or unduly influence any auditor. An employee who has knowledge of any unreported or improperly reported financial activity must report such information to a supervisor, the Ethics Officer or to the Chairman of the Audit Committee of the Board pursuant to our Accounting, Internal Accounting Controls and Auditing Complaint Reporting Procedures.

The Company recognizes that the investment community derives information regarding the Company's financial condition primarily from the Company's filings with the Securities and Exchange Commission. To promote the transparency of its financial operations, the Company has a strict policy requiring that all filings with the Securities and Exchange Commission be fair, accurate, timely and understandable.

38. Similarly, the Director Defendants are required to comply with the Company's Corporate Governance Guidelines which state:

**Director Responsibilities**

> The basic responsibility of the directors is to exercise their reasonable business judgment on behalf of the Company. In discharging that obligation, directors shall be entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors.
>
> Information and data that are important to the Board's understanding of the business to be conducted at a Board meeting should generally be distributed in writing to the Board before the meeting. Directors should review in advance any materials sent to them before the meeting. A director should endeavor to attend all Board meetings and all meetings of Board committees on which such director sits.
>
> The non-management directors will meet in regularly scheduled executive sessions without management participation, with the objective of meeting twice a year. The name of the director who presides at these meetings will be disclosed in the annual proxy statement. If the group of non-management directors includes any directors who are not independent, at least once per year an executive session comprising only independent directors will be scheduled. The Chairman of the Board will preside over all such executive sessions; provided, however, that if the Chairman of the Board is not an independent director, then the Lead Director will preside over all such executive sessions (see "—Lead Director").

39. The Director Defendants are expected to promote the best interests of the Company's stockholders in terms of corporate governance, fiduciary responsibilities, risk management, compliance with applicable laws and regulations, and maintenance of accounting, financial and other internal controls.

40. Additionally, the Audit Committee Charter specifically provides that the primary responsibilities and duties of the members of the Audit Committee—Defendants Crandall, Craig, and Hartman—include, among other things, to:

> (A) assist Board oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the Company's internal audit function and independent auditors; (B) prepare an audit committee report as required by the Securities and Exchange Commission ("SEC") to be included in the Company's annual proxy statement; and (C) perform the duties and have the responsibilities and powers set forth herein.

41. The Audit Committee Charter further explains the Committee's responsibilities as follows:

> The Committee's principal responsibility is one of oversight. The Company's management is responsible for preparing the Company's financial statements and the independent auditors are responsible for auditing and/or reviewing those financial statements. The role of the Committee does not include the provision of any expert or special assurance as to the accuracy or completeness of the Company's financial statements or any professional certification as to the quality or adequacy of the independent auditors' work. The Committee shall also have authority to obtain advice and assistance from internal or external legal, accounting or other advisors. Any communications between the Committee and legal counsel in the course of obtaining legal advice will be considered privileged communications of the Company and the Committee will take all reasonable steps necessary to preserve the privileged nature of those communications. In carrying out its responsibilities, the Committee believes its policies and procedures should remain flexible in order to best react to changing conditions and circumstances.
>
> The Committee's specific responsibilities and powers are to:
>
> <u>General</u>
>
> - Meet separately with each of management, Company personnel responsible for the internal audit function and the independent auditor on a periodic basis. At least a portion of each meeting with the independent auditor will be held in executive session.
> - Retain, at the Company's expense, independent counsel, accountants or other advisors for such purposes as the Committee determines to be necessary to carry out its responsibilities. The Company shall provide appropriate funding, as determined by the Committee in its capacity as a committee of the Board, for payment of (i) compensation to any independent auditor, (ii) compensation to any other accountant or advisor retained by the Committee, and (iii) ordinary administrative expenses necessary or appropriate in the Committee's performance of its duties.
> - Perform an annual evaluation of the Committee's performance, and report the results of this evaluation to the Board, together with the Committee's recommendations based on such evaluations.
> - Review and evaluate, at least annually, the adequacy of this Charter and recommend any appropriate changes to the Board.
> - Regularly report to the Board the actions and activities of the Committee, and review with the Board any issues that arise

with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditor or the performance of the internal audit function and other matters related to the Committee's functions and responsibilities.

- Periodically review with management and the independent auditor the applicable law and the Listing Rules relating to the qualifications, activities, responsibilities and duties of audit committees and compliance therewith, and also take, or recommend that the Board take, appropriate action to comply with such law and rules.

- Undertake such additional responsibilities as from time to time may be delegated to it by the Board, required by the Company's Certificate of Incorporation or Bylaws or required by law or Listing Rules. Financial Statement and Disclosure Matters

- Meet to review and discuss with the independent auditor and management the Company's audited annual financial statements and other information that is to be included in the Company's annual reports on Form 10-K, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the independent auditor's opinion with respect to the financial statements, and determine whether to recommend to the Board that the financial statements be included in the Company's annual report on Form 10-K filed with the SEC.

- Meet to review and discuss with the independent auditors and management, and require the independent auditors to review, the Company's interim financial statements and other information to be included in the Company's quarterly reports on Form 10-Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing such reports with the SEC.

- Review and discuss with management, in advance of release, any press releases of the Company that include operations or financial guidance or financial information, including "pro forma" or "adjusted" non-GAAP information, as well as financial information and guidance provided to analysts and rating agencies. Such discussion may be of a general nature (i.e., it may consist of discussions of the types of information to be disclosed and the types of presentations to be made). The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

- Prepare an audit committee report as required by the SEC to be included in the Company's annual proxy statements.

***

<u>Oversight of Internal Audit Function, Risk Management and Compliance</u>

- Review annually the performance and material findings of internal audit reviews.
- Review annually with management its conclusion regarding the effectiveness of the Company's internal control over financial reporting, and discuss such conclusion with Company personnel responsible for the internal audit function and the independent auditor.
- Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.
- Discuss policies with respect to risk assessment and risk management, and review major risk exposures (whether financial, operating or otherwise) and the guidelines and policies that management has put in place to govern the process of assessing, controlling, managing and reporting such exposures.
- Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Investigate any matter brought to its attention related to financial, accounting and audit matters and, to the extent it deems necessary or advisable in connection therewith, review any Company books and records and interview any Company personnel.
- Review and approve all proposed transactions that would require disclosure pursuant to Item 404 of Regulation S-K or any other transaction involving the Company and any other person where the parties' relationship is not arms'-length including, without limitation, any transaction between the Company and (i) any director or executive officer of the Company; (ii) any nominee for election as a director; (iii) any holder of Company securities owning more than 5% of any class of Company stock and (iv) any member of the immediate family of any of the foregoing; provided, however, that the Committee does not need to review and approve compensatory arrangements between the Company and its directors or executive officers if such arrangements are reviewed and approved by the Compensation Committee.

42. Similarly, the members of the Compensation Committee—Defendants Sarma, Craig, Fox, and Hartman—owed additional duties. Pursuant to the Compensation Committee Charter, the primary responsibility of the Compensation Committee is "to discharge the Board's responsibilities relating to compensation of the Company's Chief Executive Officer and the Company's other executive officers." As such, Defendants Sarma, Craig, Fox, and Hartman as Compensation Committee members had the following additional responsibilities:

> The Committee has sole authority to (1) retain and terminate any compensation consultant to be used to assist it in the evaluation of CEO, executive officer and non-employee director compensation, and (2) approve such consultants' fees and retention terms. The Committee shall also have authority to obtain advice and assistance from internal or external legal, accounting or other advisors. Any communications between the Committee and legal counsel in the course of obtaining legal advice will be considered privileged communications of the Company and the Committee will take all reasonable steps necessary to preserve the privileged nature of those communications.
>
> The Committee seeks to assure that the CEO, other executive officers, and key management of the Company are compensated and motivated effectively in a manner consistent with such criteria as the Committee determines to be necessary and/or desirable, including specifically, competitive practices/trends, the requirements of appropriate regulatory bodies, the compensation principles and strategies of the Company, and fiduciary and corporate responsibility, including internal equity considerations.
>
> The Committee's specific responsibilities and powers are to:
>
> • Develop, review and approve the principles guiding the Company's executive compensation philosophies.
>
> • Establish annual and long-term corporate goals and objectives relevant to the CEO and other executive officers and evaluate the CEO's and other executive officer's performance in light of those goals and objectives (and such other factors as the Committee deems appropriate in the best interests of the Company and in satisfaction of any applicable requirements of the NYSE and any other legal or regulatory requirements) and determine and approve the payments of any compensation with respect to meeting such goals and objectives.
>
> • Review and approve the base salary, bonuses, equity awards, perquisites and other compensation and benefit plans for the CEO and all of the Company's other executive officers.

• Make recommendations to the Board with respect to any compensation matters and equity based plans that are subject to Board approval.

• Review and approve any employment, severance and/or change in control agreements for the CEO and all of the Company's other executive officers as and when the Committee determines to be appropriate.

• Assist the Nominating and Governance Committee of the Board with the evaluations of potential successors to the CEO and, to the extent deemed desirable by the Nominating and Governance Committee, help ensure that a succession plan for the CEO and other key executive officers of the Company is in effect.

• Review and recommend to the Board the compensation to be paid by the Company to non-employee directors with respect to service on the Board and Board committees, including cash-based and equity-based compensation.

• Produce a report of the Committee on executive officer compensation as required by the SEC to be included in the Company's annual proxy statements or annual report on Form 10-K filed with the SEC.

• Review and recommend changes, if any, to this Charter.

• Act as the administering committee, to the extent such administrative authority has not otherwise been delegated properly to a different committee (whether of the Board or one composed of employees of the Company), individual or entity, for the Company's equity, bonus, retirement, deferred compensation, fringe benefit and welfare benefit plans and any other stock or cash compensation arrangements that may be adopted by the Company from time to time, with such authority and powers.

• Perform an annual evaluation of the Committee's performance, and report the results of this evaluation to the Board, together with the Committee's recommendations based on such evaluation.

• Review and discuss the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and, based on such review and discussion, recommend to the Board whether to include the Compensation Discussion and Analysis in the Company's annual report on Form 10-K, proxy statement on Schedule 14A or information statement on Schedule 14C.

• Obtain, as the Committee so determines in its sole discretion, per Rule 10C-1 of the Exchange Act, the advice of a compensation advisor (for which the Committee is directly responsible for the appointment, compensation and oversight of, with such funding being paid by the Company).

> • If the Committee engages a compensation consultant, legal counsel or other adviser (other than in-house legal counsel), it must consider the following six independence factors: (i) whether the compensation consulting company employing the compensation adviser is providing any other services to the Company; (ii) how much the compensation consulting company who employs the compensation adviser has received in fees from the Company, as a percentage of that person's total revenue; (iii) what policies and procedures have been adopted by the compensation consulting company employing the compensation adviser to prevent conflicts of interest; (iv) whether the compensation adviser has any business or personal relationship with a member of the Committee; (v) whether the compensation adviser owns any stock of the company; and (vi) whether the compensation adviser or the person employing the adviser has any business or personal relationship with an executive officer of the Company.
>
> • Undertake such additional responsibilities as from time to time may be delegated to it by the Board, required by the Company's Certificate of Incorporation or Bylaws or required by law or the Listing Rules.

43. In addition to the Committees described above that have functioning charters, in 2012 the Board designated a Strategic Oversight Committee, currently comprised of Defendants Crandall (as Chairman), Craig, Fox, and Sarma, to advise the Board regarding corporate strategy and related matters. The Company has not yet published a formal charter for the Strategic Oversight Committee.

44. Several of the Individual Defendants also have an extensive background in the for-profit education system and were well-informed of accreditation's import. Defendants Clark, McAuliffe, and Sheng all previously served at for-profit education behemoth University of Phoenix. Additionally, Defendant Craig is a founding partner of University Ventures, which is a private equity firm focused on for-profit education, and previously worked at private equity firm Warburg Pincus in the education department. Defendants Hackett and Sarma also have several years of experience in the for-profit education sector at Warburg Pincus. Defendant Hartman served the Universal Technical Institute, a for-profit technical education company. Defendants Clark, McAuliffe, Craig, Hackett, Sarma and Hartman all had extensive previous knowledge of the

importance of accreditation and the accreditation process and therefore owed a duty to the Company to share that knowledge with the other officers and directors and to act accordingly.

45. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Bridgepoint, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were or should have been aware posed a risk of serious injury to the Company.

46. The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its accreditation prospects as detailed herein, by failing to properly oversee the Company's business and operations, and by failing to prevent the Individual Defendants from taking such illegal actions. As a result Bridgepoint has expended, and will continue to expend, significant sums of money, has suffered a severe drop in stock price, and has suffered a continued loss of reputation and goodwill.

## FACTUAL ALLEGATIONS

### Company Background

47. Bridgepoint is a provider of for-profit post-secondary education services. The Company owns and operates two physical academic institutions,

Ashford University and University of the Rockies. These institutions primarily deliver academic programs online, but also have traditional campuses.

48. Bridgepoint derives a substantial amount of its revenue from various federal student financial assistance programs under Title IV of the Higher Education Act of 1965. This assistance takes many forms including Pell Grants, Stafford Loans, and PLUS loans. For instance, in 2009, 2010, and 2011, Ashford received 85.5%, 85.0%, and 86.8%, respectively, of its revenues from these Title IV programs, accounting for over $600 million per year. When including Department of Defense funding, Bridgepoint received 93.7% of its 2010 revenue from the federal government. In order for students to be eligible for these federal programs, higher education institutions must be accredited by a Department of Education approved accreditor. There are currently six regional accreditors approved by the Department of Education:

a. The Middle States Association of Colleges and Schools – for New York, New Jersey, Pennsylvania, Delaware, Maryland, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, as well as schools for American children in Europe, North Africa, and the Middle East;

b. The New England Association of Schools and Colleges – for Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont;

c. The North Central Association of Schools and Colleges – for Arkansas, Arizona, Colorado, Iowa, Illinois, Indiana, Kansas, Michigan, Minnesota, Missouri, North Dakota, Nebraska, New Mexico, Ohio, Oklahoma, South Dakota, Wisconsin, West Virginia, and Wyoming;

d. The Northwest Commission on Colleges and Universities – for Alaska, Idaho, Montana, Nevada, Oregon, Utah, and Washington;

e. The Southern Association of Colleges and Schools – for Virginia, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Alabama, Tennessee, and Texas; and

f. The Western Association of Schools and Colleges – for California, Hawaii, Guam, American Samoa, Micronesia, Palau, and the Northern Marianas Islands, as well as schools for American children in Asia.

49. When Bridgepoint purchased The Franciscan University of the Prairies in March 2005, the school was accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools as it had been for decades prior to the purchase. In fact, the school was not due for a full accreditation review until 2014. Upon purchase, Bridgepoint converted the non-profit traditionally modeled 312-student catholic Franciscan University of the Prairies into the massive for-profit Ashford University empire. After the purchase, HLC performed a "change of control" review and affirmed Ashford's accreditation. HLC reviewed and affirmed Ashford's accreditation again in 2006, and performed another "change of control" review in 2010 following Bridgepoint's initial public offering ("IPO").

50. Bridgepoint purchased Franciscan University in order to use the school's existing accreditation to expand its nationwide online programs. Bridgepoint aggressively marketed Ashford and quickly the school's enrollment increased from 312 when under Franciscan control to around 10,000 in 2007 and around 90,000 in 2012. The marketing consisted of extremely aggressive telemarketing calls made to prospective students, media advertising, and the sponsorship of a college football bowl game. In 2009, Bridgepoint allocated 18% of its revenue ($82 million) to profit and 32.1% of its revenue ($146 million) to marketing and recruiting. Breaking those numbers down by student, Bridgepoint

spent $1,212 per student on instruction in 2009, compared to $2,604 on marketing and $1,460 on profit. Bridgepoint spent a higher proportion of its revenue on marketing than any other publicly traded education company, maintaining a tenuous ratio for an institution seeking accreditation for educational efficacy. This was one of several reasons for the WASC's denial of accreditation. The telemarketing calls were made from employees in the San Diego office. The telemarketers would focus on individuals who were likely to sign up to "attend" Ashford, not those who were likely to succeed or complete their degree at Ashford. A dirty secret of Bridgepoint's reliance on federal student assistance programs is that students need only be enrolled for four weeks in order for Bridgepoint to receive a large portion of the federal funding. After those initial four weeks, Company support for students would drop off greatly. These would eventually be the student persistence issues cited by the WASC in its denial of accreditation. Bridgepoint had offices in San Diego and a substantially large portion of its new student base also resided in the San Diego area. Because the bulk of Ashford academic offerings were based online, the students did not have to ever visit or physically attend Ashford's actual campus in Clinton, Iowa.

51. Additionally, these aggressive telemarketing calls to recruit students have created their own controversy. In recent years, the attorneys general of California, Iowa, New York, and North Carolina have launched investigations into Bridgepoint's consumer practices. The attorneys general are investigating whether Bridgepoint used false and/or misleading statements to prospective students in telemarketing calls, and through other sales and marketing efforts, in its attempt to increase enrollment. Bridgepoint's marketing practices have also come under fire from federal investigators. The Company is currently being investigated by the

U.S. Department of Justice for allegedly violating federal law by compensating recruiters based on the number of students they enroll.

52. As for-profit online educational institutions have developed, the accreditation agencies attempted to evolve to properly evaluate them. Bridgepoint's tactic of buying a failing but accredited school on which to piggyback its online ventures was widespread throughout the 2000s. Therefore, towards the end of the decade, the accreditation agencies enacted rules to combat the trend and require these new ventures to endure a more substantial accreditation process closer to that of an actual upstart school seeking its initial accreditation.

53. Ashford's rising number of students located outside of the HLC's regional jurisdiction—the north central area of the United States—became a problem in 2010, when HLC adopted a policy requiring its institutions to demonstrate a "substantial presence" in the region. The policy was designed to prevent future takeovers looking aimed solely at acquiring accreditation in the form of Bridgepoint's purchase of Franciscan.

**Ashford's WASC Accreditation Application**

54. Due to the HLC "substantial presence" policy, in August 2010, Bridgepoint began the process of gaining accreditation from the Western Association of Schools and Colleges where the majority of its students were now located. Because Ashford was accredited in another region, it attempted to gain accreditation via WASC's "Pathway B." Pathway B had the same requirements as initial accreditation; it just followed a more expedited procedure. REDACTED

REDACTED

55. On March 10, 2011, the United States Senate Committee on Health, Education, Labor, & Pensions ("HELP Committee") held a hearing entitled "Bridgepoint Education, Inc.: A Case study in For-Profit Education and Oversight." The hearing focused on many of the issues that would eventually lead to WASC's denial of accreditation. The hearing pointed out how Bridgepoint allocated an above industry average amount of its revenue towards marketing and profit, focused on Bridgepoint's extremely low student retention rate, and highlighted Bridgepoint's students' extremely high student loan default rate. Defendant Clark was invited to provide testimony at the hearing but declined to do so. The HELP Committee's report had many of the same findings that WASC cited in its accreditation denial report and letter. One particularly egregious finding of the HELP Committee was that in 2010, when Ashford had 77,179 students, Bridgepoint employed just one singular career services employee.

56. REDACTED [redacted] REDACTED [redacted]

57. To kick off this new regional accreditation process, Bridgepoint met with WASC and HLC accreditation officials in April 2011 and learned the level of readiness expected of Ashford at each step in the accreditation process.

58. REDACTED [redacted] REDACTED [redacted] REDACTED [redacted] In 2010, 98% of Bridgepoint's

faculty—2,997 out of 3,028—was part-time online adjunct and yet none of them were listed on the Ashford website.

59. REDACTED [redacted]

REDACTED [redacted]

REDACTED

60. REDACTED

REDACTED May 3, 2011 when Bridgepoint announced its first quarter 2011 earnings in a press release, it stated the following:

> "We are pleased with the results we achieved in the first quarter as our new enrollments were in-line with our expectations, and I am particularly pleased that our year over year student persistence increased for the fourth consecutive quarter. The increased persistence not only resulted in better than anticipated revenue for the quarter, but it more importantly reinforces that ***the student support initiatives we made in 2010 to enhance student persistence are working as we planned. Our focus will remain on continuing to improve the programs we have in place to further enhance the academic readiness of the students who attend our institutions, and to provide students with an innovative, high quality learning experience that enriches their lives***," said Andrew Clark, Chief Executive Officer of Bridgepoint Education. [emphasis added]

61. The earnings report was accompanied with a conference call where Defendant Clark publicly stated that "we are very pleased with our progress so far." The Company also announced that its "year over year student persistence" had increased in the fourth quarter 2010, which showed that the Company's student support initiatives were having a positive impact. This persistence figure was of specific importance. "Year over year student persistence" in this instance means the programs in place to ensure that students stay in school and progress

towards their degrees based on prior years. In the conference call, Defendant Clark specifically said that persistence was increasing, but WASC denied accreditation in 2012 because it was not. The statements made by Bridgepoint regarding persistence topic were held to be false and misleading by this Court in its September 13, 2013 Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Securities Class Action.

62. REDACTED [redacted]

REDACTED [redacted]

**The Individual Defendants Receive "Early Notice" from WASC of Ashford's Shortcomings**

63. As part of WASC's "Pathway B," the WASC Eligibility Review Committee will early in the process highlight any issues that the institution should address in its self-study and site visit. On May 23, 2011 and June 3, 2011, WASC provided Bridgepoint with two "early notice" letters spelling out several areas of

focus that needed to be addressed in order to obtain WASC accreditation. These areas included: (a) inadequate student retention and completion, (b) insufficient student progress tracking, (c) an insufficient core of full-time faculty members, and (d) lack of an empowered and independent governing board.

64. These "early notice" letters precisely described the reasons why WASC would eventually deny accreditation and gave the Individual Defendants knowledge that Ashford was woefully short of accreditation on multiple aspects of the WASC Standards of Accreditation and, therefore, Ashford's WASC application for initial accreditation would eventually be denied. In fact, when later denying Ashford's application in July 2012, WASC emphasized that Ashford had been given "early notice" of "WASC concerns in each of" the accreditation standards upon which denial was based. Moreover, they echoed the findings of the HELP Committee. However, even following these "early notice" letters, Bridgepoint continued to portray Ashford's accreditation prospects positively in various press releases, conference calls, and other communications with the public.

65. REDACTED REDACTED [redacted] REDACTED [redacted] several of the Individual Defendants acted upon the knowledge obtained in the "early notice" letters to benefit themselves personally by selling their Bridgepoint stock at artificially inflated prices. During July 2011, Defendant Clark sold 188,878 shares, 67,466 of which amounting to over $1.5 million in proceeds were sold on July 21 and 22 when Bridgepoint stock was at its Relevant Period high. Additionally, Defendant Devine unloaded 40,100 shares in July, selling 21,600 of them on July 21, the day of Bridgepoint's peak price, amounting to over $1 million in proceeds. Defendant

McAuliffe also sold a large number of shares after the Company received the "early notice" letters. She unloaded 200,000 shares worth $4,563,843 between the receipt of the letters and the WASC's Ashford campus in March 2012. Most shockingly, majority shareholder Warburg Pincus, which is the full-time employer of Defendants Hackett and Sarma, filed to sell its 65% stake in Bridgepoint on July 25, 2011. Warburg Pincus most likely aimed to force the Company to go private, but no buyer was ever found and Warburg Pincus never completed the sale of its shares and still retains 63.9% control of Bridgepoint.

66. REDACTED [redacted]

REDACTED [redacted]

67. In the public statements following the "early notice" letters, in the form of second quarter 2011 earnings press release and corresponding conference call the Company continued to paint a rosy picture of its accreditation prospects. In the press release, Defendant Clark stated that "During the first half of 2011, our institutions continued to make progress on key initiatives to improve the academic readiness of students and to provide students with an innovative, high quality

learning experience…." In the corresponding conference call, Defendant Clark asserted:

> We continue to believe that maintaining a high level – high level of persistence level is an important goal for both of our institutions and demonstrates that our institutions are successfully engaging students and delivering a quality education experience that enhances student's lives. We will continue to focus on improving persistence . . . .
>
> * * *
>
> We are pleased with our progress in the first half of 2011. We have achieved significant key initiatives, strengthened our support for students and faculty through developing new technologies and enhanced transparency for prospective students.

68. In the same conference call, Defendant McAuliffe told investors and analysts that Ashford had been approved for WASC's Pathway B application process, requiring Ashford to submit a self-study review in December 2011 and to host a WASC onsite campus visit in March 2012. Defendant McAuliffe made no mention of the "early notice" letters and their warnings of the issues that were plaguing Ashford's accreditation chances. In fact, Defendant McAuliffe even voiced her optimism that Ashford would receive accreditation by stating "The University faculty and staff are hard at work preparing a self-study that portrays the institutions' strengths and achievements, as well as reflecting on what can further be developed in order to advance the institution. I couldn't be more pleased with where Ashford University is in the process."

69. REDACTED [redacted]

REDACTED [redacted]

REDACTED [redacted]

70. On November 1, 2011, when Bridgepoint released its third quarter 2011 earnings, it once again trumpeted an optimistic outlook regarding WASC accreditation for Ashford and did not mention any of the possible issues that stood in the way of accreditation.

71. REDACTED [redacted]

REDACTED [redacted]

72. REDACTED [redacted]

REDACTED [redacted]

REDACTED

[redacted]

73. On December 7, 2011, Defendant Clark continued to tell the public that the accreditation process was proceeding as planned. In fact, he bragged about Ashford's 2010 and 2011 initiatives for student preparedness at the William Blair & Company, LLC Global Services Stock Conference. In his comments, Defendant Clark described the accreditation process as follows:

> Yes, I mean, it's a very straightforward process. We submit our self-study in December. The visit is in March. We expect a decision kind of midyear next year. You know, it not – you're not isolated in the process. It's not like you submit the self-study and walk away. There is a lot of dialogue back and forth, back when we put our application in, throughout the entire process, and so that's very positive. We have a deep, deep bench academically. Dr. McAuliffe, who is our Chief Academic Officer, has been tremendously successful at changes of ownership, reaccreditation, receiving the full ten years allowed.

> Doctor Tice is the President of Ashford. I mean we have a lot of confidence in the academic team there.
>
> WASC has been delightful to work with. They're very focused on assessment, which is great from our standpoint.
>
> ***
>
> So I'm, as you can probably tell, I feel very good about where we are at.

74. REDACTED [redacted] REDACTED [redacted]

REDACTED [redacted] In its July 3, 2012 letter denying accreditation, the WASC described the self-study as follows:

> The report was well organized and written, but it would have been enhanced by deeper self-analysis, reflection, and inclusion of plans for improvement in identified areas. Following its initial review of the report, the WASC peer review team requested an extensive amount of additional documentation to verify information and to better understand the report narrative.

75. REDACTED [redacted] REDACTED [redacted]

76. Bridgepoint's next public statements came in the form of its 2011 annual report released March 6, 2012. The report stated that the self-study was submitted without issue and that the onsite visit was to take place during the month of March. In the accompanying press release, Defendant Clark made the following statement:

> In 2011, I am very pleased to report that both our institutions improved the quality of the student learning experience through the increased use of innovative technologies. To this end, we have made and will continue to make investments designed to improve our students' learning outcomes and their educational experience at our

> institutions. In 2011, we believe these investments in the student learning experience were responsible for improved student persistence and graduation rates, and we expect that our focus on these investments will continue to produce similar results in the future.

77. During the corresponding conference call, Defendant McAuliffe made a similar statement regarding accreditation:

> No[w] I would like to give you an update on Ashford University's WASC migration process. The leadership is pleased with its interactions with the WASC team. The faculty and staff submitted the self-study and all required documentation in a timely fashion. Ashford University is ready to welcome the WASC visiting team members later this month. Once complete, the visiting team will prepare a report to the WASC Board.
>
> We continue to expect a decision on Ashford University's application to WASC in mid-2012. We believe this move will enhance the institution's ability to succeed in its mission of providing accessible, affordable, innovative, and high quality learning opportunities and degree programs that meet the diverse needs of our students.
>
> Ashford University remains in good standing with our current [accreditor] and we are keeping them well informed of our work to date with WASC. We will keep you updated on the process.

78. Following these statements, several analysts, such as Wunderlich Securities and William Blair & Company, LLC, still felt the risk Ashford would not obtain accreditation was low.

79. Defendants Clark and Devine followed up on the annual report by also speaking at the March 13, 2012 Credit Suisse Global Services Conference. This conference actually took place during the WASC's onsite visit to Ashford University which spanned March 11 to 16, 2012. Defendant Clark stated at the conference that Bridgepoint would continue to invest in more full-time faculty, and Defendants Clark and Devine made other statements that led analysts William Blair & Company and Piper Jaffray to express confidence that Ashford would obtain WASC accreditation in the summer of 2012.

80. REDACTED [redacted]

REDACTED [redacted]

81. REDACTED [redacted]

REDACTED [redacted]

82. The final public statement before the denial of accreditation came on May 1, 2012 and it is perhaps the most directly misleading. In the Company's first quarter 2012 earnings press release, Defendant Clark stated:

> We are pleased that our operating and financial results were in-line with our internal expectations for the quarter, and we are particularly pleased by the strong increase in student persistence at our universities. Increasing persistence reflects our success with the student support and quality initiatives we are implementing, which help assure the academic readiness of students and help provide students with an innovative, high quality learning experience that enriches their lives.

83. In his statement, Defendant Clark expressed pleasure with Bridgepoint's increase in student persistence; conversely in its accreditation denial letter, WASC determined that Bridgepoint's efforts towards student persistence had no measurable effect. Further, claims such as this about the persistence issue were found to be misleading by this Court in its Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the Securities Class Action. Perhaps foreshadowing the impending denial of accreditation, during her portion of the conference call, Defendant McAuliffe refused to answer any questions about the exit interview portion of the WASC onsite visit and to identify any recently implemented initiatives at Ashford aimed to increase student persistence. Her evasive action was noted by some analysts at Deutsche Bank and Credit Suisse, but ignored by other analysts at Deutsche Bank and by analysts at Piper Jaffray who following the conference call expressed that they continued to expect that the WASC would accredit Ashford.

84. REDACTED [redacted] REDACTED [redacted]

REDACTED

[redacted]

**Ashford's Accreditation is Denied by WASC**

85. On July 3, 2012, Bridgepoint received news that shocked the investing public. WASC President Ralph A. Wolff sent Ashford an Action Letter denying its application for accreditation. The Action Letter was accompanied by a public statement, which read, in relevant part, as follows:

> At its meeting on June 15, 2012, the Accrediting Commission for Senior Colleges and Universities of the Western Association of Schools and Colleges (WASC) acted to deny initial accreditation to Ashford University.
>
> The Commission found that Ashford University was not yet in substantial compliance with elements of Standard 1 (Defining Institutional Purposes and Ensuring Educational Objectives), Standard 2 (Achieving Educational Objectives through Core Functions), Standard 3 (Developing and Applying Resources and Organizational Structures to Ensure Sustainability), and Standard 4 (Creating an Organization Committed to Learning and Improvement), as required for initial accreditation.

86. The Action Letter cited several specific areas of failure for Ashford that included the areas of:

a. Attrition, support for student achievement, and adequate levels of degree completion;

b. Adequacy and alignment of resources with educational purposes;

c. Adequacy of the Ashford faculty model and the role of faculty;

d. Effectiveness of program review;

e. Assessing student learning and assuring academic rigor; and

f. Independence of the Ashford governing board

87. The Action Letter provided extensive details for each of the above listed failures and noted that Bridgepoint had been aware of these issues since they were the focus of WASC's "early notice" letters sent over one year earlier, on May 23 and June 3, 2011. The Action Letter addressed the early warning given to Bridgepoint thusly:

> Notably, Ashford was notified about WASC concerns in each of these areas by WASC and its Eligibility Review Committee in letters to Ashford dated May 23 and June 3, 2011, providing Ashford with early notice about these concerns. Given that there were multiple areas in which substantial compliance could not be demonstrated and that these areas fell into several aspects of the Standards of Accreditation, the Commission determined that a denial of initial accreditation of Ashford was the appropriate action.

88. REDACTED [redacted]

REDACTED [redacted]

89. REDACTED [redacted]

REDACTED [redacted]

REDACTED

90. RED ACTE press release and Form 8-K were released the next day. They announced the WASC accreditation denial, while also attempting to reassure investors that Ashford was still accredited by HLC and not due for another comprehensive evaluation until 2014-2015. The press release also told the world that Ashford would both appeal the WASC's decision and reapply for WASC accreditation in 2013. When this information was released to the public it caused Bridgepoint stock to drop $7.25 per share to close at $14.25 per share on July 9, 2012, a decline of nearly 34% of the Company's market capitalization.

91. REDACTED

REDACTED

92. The next day, on July 12, 2012, Bridgepoint received a letter from HLC, who was now officially Ashford's only accreditor, stating that HLC had put Ashford on "special monitoring status" due to the WASC accreditation denial and other allegedly significant deficiencies. HLC cited several of the same issues as WASC, and asked Ashford to demonstrate compliance with HLC accreditation standards by providing:

> (i) evidence that Ashford University meets the HLC Criteria for Accreditation relating to the role and autonomy of the University's

> governing board and its relationship with Bridgepoint Education, including the role of faculty in overseeing academic policies and the integrity and continuity of academic programs, (ii) evidence that Ashford University's resource allocations are sufficiently aligned with educational purposes and objectives in the areas of student completion and retention, the sufficiency of full-time faculty and model for faculty development, and plans for increasing enrollments, and (iii) evidence demonstrating that Ashford University has an effective system for assessing and monitoring student learning and assuring academic vigor.

93. The letter explained that there were three possible outcomes following Bridgepoint's response: (1) the HLC board could continue accreditation, with or without further monitoring, (2) the HLC board could continue accreditation under sanction or "Show Cause" order, or (3) the HLC board could withdraw accreditation. The next day, on July 13, 2012, Bridgepoint disclosed the HLC "special monitoring status" letter in a Form 8-K. When this information was released to the public it caused Bridgepoint stock to drop $3.20 per share to close at $9.77 per share on July 13, 2012, a decline of nearly 25% of the Company's market capitalization. Together, the disclosure of the WASC denial and the HLC "special monitoring status" resulted in a near 55% total drop in Bridgepoint market capitalization.

94. REDACTED [redacted] REDACTED [redacted]

95. REDACTED [redacted] REDACTED [redacted]

REDACTED [redacted]

REDACTED [redacted] These actions all would have been beneficial for Bridgepoint if taken immediately following the receipt of WASC's "early notice" letters; at this point they were too late to protect the Company from the public shamings that were an accreditation denial and a "special monitoring status" letter.

96. REDACTED [redacted]

REDACTED [redacted]

**Defendants Clark, Devine, and McAuliffe Reap the Benefits of Their Material Non-Public Knowledge**

97. The Individual Defendants knowingly made false statements and concealments regarding the Company anticipated accreditation which artificially inflated Bridgepoint's stock price over the Relevant Period. Defendants Clark, Devine, and McAuliffe, based on their knowledge of material non-public information regarding the Company, dumped millions of dollars of Company stock while the stock price was artificially inflated.

98. In sum, Defendants Clark, Devine, and McAuliffe sold a total of 1,324,625 shares of Company stock, garnering a total of $30,435,722 in gross profits, as follows:

| Insider | Transaction Date | Shares | Share Price | Proceeds |
|---|---|---|---|---|
| **Clark** | 01-Jun-2011 | 51,102 | $23.74 | $1,213,161 |
| | 01-Jul-2011 | 49,496 | $25.25 | $1,249,774 |
| | 06-Jul-2011 | 900 | $28.00 | $25,200 |
| | 13-Jul-2011 | 71,016 | $28.06 | $1,992,709 |
| | 21-Jul-2011 | 17,297 | $30.02 | $519,256 |
| | 22-Jul-2011 | 50,169 | $30.35 | $1,522,629 |
| | 01-Aug-2011 | 47,940 | $24.81 | $1,189,391 |
| | 01-Sep-2011 | 3,000 | $21.81 | $65,430 |
| | 01-Sep-2011 | 43,433 | $21.24 | $922,517 |
| | 03-Oct-2011 | 42,574 | $16.89 | $719,075 |
| | 03-Oct-2011 | 2,400 | $17.72 | $42,528 |
| | 01-Nov-2011 | 33,660 | $22.45 | $755,667 |
| | 01-Nov-2011 | 9,900 | $23.36 | $231,264 |
| | 01-Dec-2011 | 42,191 | $21.31 | $899,090 |
| | 03-Jan-2012 | 9,441 | $23.50 | $221,864 |
| | 03-Jan-2012 | 31,424 | $22.65 | $711,754 |
| | 01-Feb-2012 | 39,580 | $25.01 | $989,896 |
| | 01-Mar-2012 | 38,336 | $23.89 | $915,847 |
| | 02-Apr-2012 | 37,131 | $24.95 | $926,418 |
| | 01-May-2012 | 32,564 | $20.27 | $660,072 |
| | 01-May-2012 | 3,400 | $21.33 | $72,522 |
| | 01-Jun-2012 | 34,833 | $18.88 | $657,647 |
| | 02-Jul-2012 | 33,738 | $21.75 | $733,802 |
| | | **725,525** | | **$17,237,513** |
| **Devine** | 05-May-2011 | 18,500 | $18.86 | $348,910 |
| | 03-Jun-2011 | 7,730 | $24.56 | $189,849 |
| | 03-Jun-2011 | 10,770 | $25.10 | $270,327 |
| | 01-Jul-2011 | 18,500 | $25.25 | $467,125 |
| | 21-Jul-2011 | 21,600 | $30.03 | $648,648 |
| | 03-Aug-2011 | 18,500 | $21.83 | $403,855 |
| | 06-Sep-2011 | 18,500 | $20.06 | $371,110 |
| | 03-Oct-2011 | 17,400 | $16.88 | $293,712 |
| | 03-Oct-2011 | 1,100 | $17.71 | $19,481 |
| | 04-Nov-2011 | 18,500 | $23.12 | $427,720 |
| | 01-Dec-2011 | 18,500 | $21.31 | $394,235 |

| | | | | |
|---|---|---|---|---|
| | 04-Jan-2012 | 17,428 | $20.88 | $363,897 |
| | 04-Jan-2012 | 1,072 | $21.62 | $23,177 |
| | 03-Feb-2012 | 18,500 | $26.87 | $497,095 |
| | 05-Mar-2012 | 18,500 | $23.62 | $436,970 |
| | 04-Apr-2012 | 17,300 | $24.31 | $420,563 |
| | 04-Apr-2012 | 1,200 | $25.02 | $30,024 |
| | 02-May-2012 | 18,500 | $20.27 | $374,995 |
| | 04-Jun-2012 | 18,500 | $18.22 | $337,070 |
| | 03-Jul-2012 | 18,500 | $21.67 | $400,895 |
| | | **299,100** | | **$6,719,657** |
| **McAuliffe** | 12-May-2011 | 20,000 | $21.17 | $423,400 |
| | 13-Jun-2011 | 20,000 | $23.59 | $471,800 |
| | 11-Jul-2011 | 17,439 | $26.26 | $457,948 |
| | 11-Jul-2011 | 2,561 | $27.04 | $69,249 |
| | 09-Aug-2011 | 7,750 | $20.27 | $157,093 |
| | 09-Aug-2011 | 12,250 | $21.09 | $258,353 |
| | 12-Sep-2011 | 20,000 | $20.17 | $403,400 |
| | 10-Oct-2011 | 20,000 | $19.61 | $392,200 |
| | 11-Nov-2011 | 20,000 | $22.12 | $442,400 |
| | 09-Dec-2011 | 20,000 | $21.63 | $432,600 |
| | 10-Jan-2012 | 20,000 | $23.59 | $471,800 |
| | 08-Feb-2012 | 20,000 | $26.20 | $524,000 |
| | 12-Mar-2012 | 20,000 | $24.15 | $483,000 |
| | 10-Apr-2012 | 4,600 | $20.96 | $96,416 |
| | 10-Apr-2012 | 15,400 | $20.34 | $313,236 |
| | 09-May-2012 | 20,000 | $20.08 | $401,600 |
| | 11-Jun-2012 | 20,000 | $18.39 | $367,800 |
| | 09-Jul-2012 | 3,300 | $15.76 | $52,008 |
| | 09-Jul-2012 | 6,700 | $16.69 | $111,823 |
| | 09-Jul-2012 | 9,800 | $14.79 | $144,942 |
| | 09-Jul-2012 | 200 | $17.42 | $3,484 |
| | | **300,000** | | **$6,478,552** |
| **TOTAL:** | | **1,324,625** | | **$30,435,722** |

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

99. The Individual Defendants, through their attendance of Board meetings, Audit Committee meetings, Strategic Oversight Committee meetings, management meetings, and conversations with the Company's management, knew

that Bridgepoint would not gain and maintain proper accreditation and knew that the Company lacked adequate internal and academic controls.

100. In breach of their fiduciary duty of good faith, and, with respect to the members of the Audit Committee, their fiduciary responsibilities as members of the Audit Committee, the Individual Defendants knowingly caused and/or willfully approved the Company's false and misleading statements, willfully ignored the obvious and pervasive problems with the Company's lack of adequate internal and academic controls, and failed to make a good faith effort to correct or prevent the recurrence of the improper conduct.

101. Furthermore, as a direct and proximate result of the Individual Defendants' misconduct, Bridgepoint has suffered damages, including but not limited to costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Bridgepoint and the illicit profits from insider stock sales.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

102. Plaintiff brings this action derivatively in the right and for the benefit of Bridgepoint to redress injuries suffered, and to be suffered, by Bridgepoint as a direct result of the Individual Defendants' breaches of fiduciary duty, gross mismanagement, waste of corporate assets, trading and/or allowing each other to trade on insider information, and unjust enrichment.

103. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

104. Bridgepoint is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is and was a shareholder of Bridgepoint at the time of the transgressions complaint of. Plaintiff will

adequately and fairly represent the interests of Bridgepoint and its shareholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

105. The wrongful acts complained of herein subject, and will continue to subject Bridgepoint to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

106. The wrongful acts complained of herein were unlawfully concealed from Bridgepoint's shareholders.

107. Throughout the Relevant Period, the Individual Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties. The course of action included misrepresenting Ashford's accreditation prospects and the internal mechanisms put in place by the Company to further accreditation, and caused the Individual Defendants to breach the following corporate principles, among others:

- Directors, officers and employees are prohibited from illegally trading the Company's securities while in possession of material, nonpublic ("inside") information about the Company;
- Maintain proper accreditation in order to ensure that the Company's students have access to Title IV federal funding; and
- maintain a system of internal controls that will provide reasonable assurances to management that material information about the Company is made known to management, particularly during the periods in which the Company's periodic reports are being prepared.

108. As a result of the facts set forth herein, Plaintiff has not made any demand on the Bridgepoint Board to institute this action. Such demand would be a futile and useless act, because the Board is incapable of making an independent

and disinterested decision to institute and vigorously prosecute this action. The wrongful acts complained of herein show a wholesale abandonment by the Individual Defendants of their fiduciary duties of due care and oversight. Such abandonment includes, but is not limited to the following:

a. Allowing for materially inadequate controls over the Company's policies and practices with respect to all material aspects of accreditation including:

i. plans to assure a proper proportion of students stay in school and advance towards a degree;

ii. plans to ensure that students are progressing at an acceptable level;

iii. maintaining a sufficient core faculty and programs to develop faculty;

iv. providing an effecting review program for assessing and monitoring student progress and learning levels;

v. providing effective systems of program and curriculum review;

vi. implementing adequate review procedures to prevent shortfalls and to ensure that they are quickly identified and remedied; and

vii. maintaining an empowered and independent Ashford University board.

b. Allowing the Company's accreditation prospects to be artificially inflated; and

c. Allowing the Company to fail to disclose pertinent, material, and important information in a timely manner.

109. At the time this action was commenced, the Board consisted of seven directors: Defendants Clark, Hackett, Craig, Hartman, Sarma, Crandall, and Fox.

110. A majority of the Board is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action for the following reasons:

a. Defendants Clark, Hackett, Craig, Hartman, Sarma, Crandall, and Fox are substantially likely to be held liable for breaching their fiduciary duties, gross mismanagement, trading and/or allowing each other to trade on insider information, and wasting corporate assets by causing the Company to release false and misleading statements and by maintaining inadequate internal controls over the Company's academic institutions as complained of herein.

b. Defendant Clark co-founded Bridgepoint and has served as a director as well as the Company's CEO since November 2003, six years before the Company's IPO. He also has served as the Company's President since February 2009. Because he is both an officer and a director he is an insider in the corporation. He is also a defendant in and the primary individual responsible for the wrongdoing alleged in the Securities Class Action. Defendant Clark is inseparably tied to all of the false and misleading statements made by Bridgepoint. As CEO, Defendant Clark had a specific duty to ensure the accuracy of the financial statements and signed each of the public filings and a certification of internal controls relating to each. Defendant Clark is not disinterested because it is very likely that he will be held liable in any action brought on behalf of the corporation for his alleged wrongdoing. During the Relevant Period, Defendant Clark received compensation in the form of $2,704,055 in total compensation in 2011 and $2,247,766 in total compensation in 2012. Defendant Clark owns 1,931,932 shares of Bridgepoint stock, accounting for 3.5% of the total shares

outstanding. Due to his extensive compensation and stock holdings, he is entrenched in the Company and cannot disinterestedly consider whether to properly bring an action on behalf of Bridgepoint against the Individual Defendants named herein; therefore demand is excused as futile.

c. Defendants Hackett, Craig, and Sarma all have substantial connections to Warburg Pincus, the private equity firm that helped found Bridgepoint and continues to hold 63.9% of the Company's outstanding stock. Both Hackett and Sarma currently serve Warburg Pincus as Managing Directors and have throughout their tenure on the Bridgepoint Board. In addition to Defendants Hackett and Sarma, Defendant Craig also has a history with Warburg Pincus. He served as an Associate at Warburg Pincus from 2001 to 2004 in the education department. Defendant Craig worked at Warburg Pincus alongside Defendant Hackett during his tenure and they have a longstanding professional relationship. Upon the Bridgepoint's IPO in February 2009, the Company entered into a nominating agreement with Warburg Pincus. Under the nominating agreement, as long as Warburg Pincus owns at least 15% of the outstanding shares of Bridgepoint common stock, the Company agrees to nominate and recommend two individuals designated by Warburg Pincus be elected to the Board. Those two directors are currently Defendants Hackett and Sarma. On top of these two Warburg Pincus nominated directors, because Bridgepoint does not employ cumulative voting, Warburg Pincus has throughout the history of the Company had the power to select all members of the Board, and has placed all seven Director Defendants on the Board. Since all Director Defendants were personally selected by Warburg Pincus and can be unilaterally removed by Warburg Pincus, they are as entrenched as Defendants Hackett and Sarma who are partners at Warburg Pincus and cannot disinterestedly consider whether to properly bring an action on

behalf of Bridgepoint against the Individual Defendants named herein. Therefore, demand is excused as futile.

111. Defendants Crandall, Craig, and Hartman all served as members of the Audit Committee during the Relevant Period. Defendant Crandall was and continues to be the Chairman of the Audit Committee. According to the Audit Committee Charter, Defendants Crandall, Craig, and Hartman had the specific duty to oversee all material aspect of the Company's reporting, control, and audit functions. By allowing the Company to report materially false and misleading statements regarding student persistence and accreditation prospects, they breached that duty. Therefore, there is a substantial likelihood that they will be held personally liable in any litigation brought on behalf of the Company. It is for this reason, among others, that the members of the Audit Committee are not disinterested and cannot reasonably decide whether to bring litigation against themselves on behalf of the corporation. Consequently, demand is excused as futile.

112. Defendants Hackett, Crandall, Craig, and Sarma all served as members of the Compensation Committee during the Relevant Period. Defendant Hackett was and continues to be the Chairman of the Compensation Committee. According to the Compensation Committee Charter, Defendants Hackett, Crandall, Craig, and Sarma had the specific duty to discharge the Board's responsibilities relating to compensation of the Company's executive officers. During the Relevant Period they breached that duty by granting oversized bonuses to the executive officers based on the inflated stock price and falsely positive statements regarding the elements of obtaining accreditation. Therefore, there is a substantial likelihood that they will be held personally liable in any litigation brought on behalf of the corporation. Consequently, demand is excused as futile.

113. During the Relevant Period the Individual Defendants caused or allowed the Company to fail to maintain proper internal controls over the core academic elements that are essential for obtaining accreditation and to issue false and misleading statements regarding the same. The Individual Defendants' misconduct has severely damaged the Company. The Company has been forced to expend untold resources in order to gain belated WASC accreditation and has been forced to defend against the Securities Class Action. Further, and more importantly, Bridgepoint's reputation, goodwill, and positive brand recognition have been tainted by the misconduct described herein.

114. As detailed above, the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees, or they completely abdicated their responsibility to oversee the Company's operations and let management run roughshod over the Company for their personal gain and caused the Company to engage in illegal and/or improper conduct that rendered the Company's public disclosures misleading, destroying in their wake, much of the Company's shareholder value. The Individual Defendants' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment. As such, demand is excused as futile.

115. The Individual Defendants' conduct described herein and summarized above demonstrates a pattern of misconduct that could not have been the product of legitimate business judgment as it was based on intentional, reckless, and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board of the Company, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Individual Defendants face a substantial

likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly demand is excused as futile.

116. Furthermore, the Bridgepoint Board is still dominated and controlled by the exact same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Bridgepoint or its shareholders. The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

a. The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

b. Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

c. The Acts complained of herein are illegal and improper and thus are acts incapable of ratification;

d. In order to bring this action for breach of fiduciary duty, the members of the Board of Directors would have been required to sue themselves and/or fellow directors and allies in the top ranks of the Company, who have personal relationships and with whom they have entangling financial alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such action; and

e. The members of the Bridgepoint Board, including each of the Individual Defendants herein, receive substantial salaries, bonuses, payments,

benefits, and other emoluments by virtue of their membership on the Board and their control of Bridgepoint. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves. The Director Defendants salaries also increased substantially during the relevant period. The Director Defendants' 2011 salaries were as follows: $101,056 for Defendant Crandall, $96,056 for Defendant Craig, $67,254 for Defendant Fox, $88,556 for Defendant Hackett, $91,056 for Defendant Hartman, and $91,056 for Defendant Sarma. The Director Defendants' 2012 salaries increased to: $174,801 for Defendant Crandall, $139,801 for Defendant Craig, $129,801 for Defendant Fox, $112,301 for Defendant Hackett, $114,801 for Defendant Hartman, and $139,801 for Defendant Sarma. Additionally, as Managing Directors and equity partners at Warburg Pincus a private equity firm that owns 63.9% of Bridgepoint's common stock, Defendants Hackett and Sarma derived a large portion of their Warburg Pincus salary and bonus from Bridgepoint's inflated performance during the relevant period.

117. Moreover, each of the Individual Defendants, as an officer or director of Bridgepoint, had intimate knowledge of all major operations of the Company, and yet participated in dissemination of material misstatements of the Company's accreditation prospects. Thus, the Individual Defendants all have a personal interest in concealing any blame for Bridgepoint's internal control problems, and shifting the blame away from themselves for consciously disregarding fiduciary

duties. An investigation or inquiry that spread blame higher up the corporate ladder—to the Individual Defendants, as officers and/or directors—would not be in the personal interest of the Individual Defendants. The result of such an inquiry would require them to return valuable but unearned compensation to the Company.

118. In addition, all defendants face a sufficiently substantial likelihood of liability, and, thus, there is a reasonable doubt as to each defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

## DAMAGES TO THE COMPANY

119. As a direct and proximate result of the Individual Defendants' misconduct, Bridgepoint failed to maintain proper academic controls, caused the Company to release false and misleading statements, and substantially damaged the Company's market capitalization and goodwill.

120. Furthermore, Bridgepoint has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a. the extensive costs, including the hiring of additional auditors and the waste of resources incurred in investigating and defending Bridgepoint and certain officers in the Securities Class Action, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

b. the extensive costs of investigating the claims asserted in the investigations into Bridgepoint undertaken by several states' attorneys general, the U.S. Department of Justice, and the U.S. Senate HELP Committee, including the costs to undertake internal investigation into the claims brought forth by the government agencies;

c. the extensive costs incurred in investigating and rectifying the deficiencies at Ashford University that caused the school to be denied initial accreditation by WASC;

d. costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Bridgepoint's artificially-inflated stock price and inflated growth prospects; and

e. costs incurred from the loss of the Company's customers' confidence in Bridgepoint's institution and products.

121. Bridgepoint has already expended great resources to reform its practices in order to meet the requirements of WASC accreditation. This reform has subjected the Company to significant cost in the form of accounting, legal, and similar professional fees, in addition to the substantial diversion of time and attention of the Company's executive officers in reforming Ashford in order to enable WASC accreditation.

122. Moreover, these actions have irreparably damaged Bridgepoint's corporate image and goodwill. For at least the foreseeable future, Bridgepoint will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Bridgepoint's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## COUNT I
## DERIVATIVELY AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

123. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

124. The Individual Defendants owed and owe Bridgepoint fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants

owed and owe Bridgepoint the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

125. All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

126. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to make false and misleading statements regarding the Company's academic programs and their prospects of accreditation and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127. The Individual Defendants caused or allowed Bridgepoint to lack requisite internal controls, and, as a result, the Company made false and misleading statements that have come back to hurt the Company greatly.

128. The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

129. The Individual Defendants caused or allowed the prospects of accreditation to be materially misstated and misrepresented the adequacy of the Company's student persistence programs.

130. The Individual Defendants caused or allowed Bridgepoint to fail to disclose pertinent and material information.

131. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Bridgepoint has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

**DERIVATIVELY AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL**

132. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

133. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bridgepoint, for which they are legally responsible. Among the abuses of control was: (i) the Individual Defendants' failure to supervise, and to exert internal controls over, and conscious disregard of responsibilities involving the Company's academic programs that must be accredited and (ii) the Individual Defendants' reckless and/or grossly negligent failure to properly utilize corporate wide stress tests to determine whether or not the Company's stated academic programs were adequate to obtain accreditation in accordance with the Company's policies.

134. As a direct and proximate result of the Individual Defendants' abuse of control, Bridgepoint has sustained significant damages.

135. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT III**

**DERIVATIVELY AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

136. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

137. By their action alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Bridgepoint in a manner consistent with the operations of a publicly held corporation.

138. The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company's public statements, as well as the Company's academic compliance.

139. The Individual Defendants caused or allowed Bridgepoint to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated academic procedures.

140. The Individual Defendants caused or allowed financial statements to be materially misstated.

141. The Individual Defendants, including members of the Audit Committee, did not take seriously their primary responsibility for the Company's academic integrity, accreditation compliance, and financial reporting activities.

142. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Bridgepoint has sustained significant damages.

143. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT IV
## DERIVATIVELY AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

144. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

145. As alleged herein, the Individual Defendants have caused Bridgepoint to waste valuable corporate assets by awarding Defendants Clark, Devine, McAuliffe, and Sheng excessive and improper compensation and benefits paid based, in part, on the false and misleading statements complained of herein.

146. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT V

## DERIVATIVELY AGAINST DEFENDANTS CLARK, DEVINE, AND McAULIFFE FOR BREACH OF FIDUCIARY DUTY OF LOYALTY AND GOOD FAITH IN CONNECTION WITH INSIDER STOCK SALES

147. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

148. At the time of each of the stock sales set forth herein, Defendants Clark, Devine, and McAuliffe knew, but did not disclose publicly, that the Company had received "early notice" of significant accreditation deficiencies that would material affect the Company's performance. Defendants Clark, Devine, and McAuliffe made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein. Defendants Clark, Devine, and McAuliffe's sales of Bridgepoint stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

149. Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Clark, Devine, and McAuliffe's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds Defendants Clark, Devine, and McAuliffe obtained thereby.

## COUNT VI

## DERIVATIVELY AGAINST DEFENDANTS CLARK, DEVINE, MCAULIFFE, AND SHENG FOR UNJUST ENRICHMENT

150. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

151. Defendants Clark, Devine, McAuliffe, and Sheng were unjustly enriched by their receipt of excessive compensation in the form of increased annual base salaries, long and short-term incentive based compensation, and cash bonuses, that were given based, in part, on the inaccurate financial statements complained of herein. They are thus in possession of money and other property which, in equity and good conscience, should be returned to the Company.

152. It would be unconscionable and against the fundamental principles of justice, equity, and good conscience to allow Defendants Clark, Devine, McAuliffe, and Sheng to retain the excessive and unwarranted financial payments they have received.

153. To remedy Defendants Clark, Devine, McAuliffe, and Sheng's unjust enrichment, the Court should enter an order compelling them to disgorge to the Company the proceeds they received from increased annual base salaries, long and short-term incentive based compensation, and cash bonuses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Against all of the Individual Defendants and in favor of Bridgepoint for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and negligence.

B. Directing Bridgepoint to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Bridgepoint and its shareholders from a repeat of the damaging events described herein.

C. Awarding the Plaintiff the costs and disbursements of this actions, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury for all claims triable to a jury.

Dated: November 1, 2013

Respectfully submitted,

**FARUQI & FARUQI LLP**

BY: ______________________

David E. Bower, Esq. (State Bar No. 119546)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, California 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-Mail: dbower@faruqilaw.com

*Attorney for Plaintiff*

**VERIFICATION**

I, James Cannon, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: October 30, 2013

James Cannon

## PROOF OF SERVICE

STATE OF CALIFORNIA )
) *ss.:*
COUNTY OF LOS ANGELES )

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 10866 Wilshire Boulevard, Suite 1470, Los Angeles, California 90024.

On November 1, 2013, I caused the following document to be served which is described as:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

by delivering true copies addressed as follows:

**SEE ATTACHED SERVICE LIST**

☒ BY ELECTRONIC SERVICE. I emailed the above document(s) from e-mail address dbower@faruqilaw.com to the respective e-mail addresses listed in the attached service list, from Los Angeles, California.

☐ BY U.S. MAIL. I caused such envelope(s) to be mailed with postage thereon fully prepaid. I am familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business.

☒ BY OVERNIGHT MAIL. I caused such envelope(s) to be deposited with the Federal Express repository. I am familiar with the firm's practice of collection and processing via Federal Express. Under that practice the package would be deposited in the Federal Express drop box on that same day with postage thereon fully prepaid in the ordinary course of business.

Executed on November 1, 2013, at Los Angeles, California.

Michael Blackman

## SERVICE LIST

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
Nina F. Locker
Ignacio E. Salceda
650 Page Mill Road
Palo Alto, California 94304-1050
Tel: (650) 320-4888
Fax: (650) 493-6811
nlocker@wsgr.com
isalceda@wsgr.com

*Attorneys for Defendants*